105 N.J. Super. 529 (1967)
253 A.2d 558
STATE OF NEW JERSEY, PLAINTIFF,
v.
HERMAN ROCHESTER, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided December 11, 1967.
*531 Mr. Guy W. Calissi, Bergen County Prosecutor argued the cause for plaintiff.
Mr. Frederick L. Bernstein, attorney, argued the cause for defendant.
BOTTER, J.S.C.
This is a motion to quash an indictment on behalf of Herman Rochester, defendant, by his assigned counsel. Herman Rochester was indicted by Indictment S-357-66, filed February 24, 1967, for unlawfully and maliciously *532 committing an assault upon Donald Baker with a certain offensive weapon and instrument to wit: a .22 caliber six shot Burgo revolver which he, the said Herman Rochester, had in his hand then and there and held contrary to provision N.J.S. 2A:90-3. The indictment was by the Bergen County Grand Jury in the September term of 1966, the second stated session. The grand jury that actually indicted was organized in early January of 1967. I believe the organization date is the first day of the second stated session which begins right after the new year. In support of this motion to quash some affidavits have been submitted. One is by Frederick Bernstein, one by his secretary, Deidra Dembia, and one by the defendant himself. I mention this because there are several things in the affidavits which may be relevant. For one thing it is the place that describes, to the extent that we have a description, the defendant. Frederick Bernstein in his first paragraph describes him as a Negro youth who was charged with having assaulted a white boy, Donald Baker. The affidavit says, "I understand that a number of the four other white boys who were with Baker at the time of the incident testified before the Grand Jury of Bergen County." The affidavits generally indicate that Mr. Bernstein was not able to obtain all the information he wished to have to support his application quashing the indictment and therefore asked for a hearing so that he could subpoena certain records and obtain additional information.
The motion to quash is in general terms. It says that the defendant will apply for an order "dismissing the indictment on the ground that the grand jury was not selected, drawn, or summoned in accordance with the law and in accordance with the provisions of the Federal and the New Jersey State Constitutions." There was attached to this motion a photocopy of a letter received by defendant's counsel on June 20, 1967. That letter is from the Prosecutor, Guy Calissi. The letter is dated June 16, 1967. It says, "Dear Mr. Bernstein: This will acknowledge receipt of your letter dated June 9, 1967 concerning the above. To the best of my knowledge, *533 there were no Negro members of the Grand Jury that indicted your client, Herman Rochester. During the period of my term which will be thirteen years on July 1, 1967, there has been one Negro on the Bergen County Grand Jury. This was several years ago, I believe in 1964 or 1965." The record shows that Spencer Wright was a Grand Juror in 1965 and that he was a Negro.
The testimony in this case consists primarily of testimony of members of the jury commission who have the responsibility of preparing lists of prospective jurors for service on petit and grand juries in this county. Unfortunately this motion was first heard in the summertime when Miss Hirt, who I believe is the chief clerk of the jury commission office, was absent. We did not have her testimony the first day. It was then continued on September 12, 1967 when we had the testimony of Mr. Valerio Callazuol, who is a jury commissioner. Then we had to have transcripts of the original hearings before we rescheduled the last hearing and ran into difficulty of counsel and Miss Hirt being on vacation, and we finally heard the balance of the testimony last Friday. That was three days ago. Introduced in evidence were various records of the jury commission's office and certain documents showing population statistics, particularly with respect to the Negro population of the County and various municipalities as compared to the population of the County as a whole. We also have introduced in evidence a manual for the use of jury commissioners of the state of New Jersey prepared by the Supreme Court of New Jersey, revised edition of May, 1961. We have as J-10 a breakdown of the apportionment of grand jurors in the County used in composing the master list of three hundred prospective grand jurors from which the ultimate number of twenty three grand jurors are selected. We have as an exhibit the questionnaire in the form prescribed by the Supreme Court which is used by the jury commissioners in determining eligibility and status of various people in the county for jury service. We have various lists of jurors, master lists of grand jurors, master lists of petit jurors. We *534 have an order of the Court which prescribes the number of petit jurors and grand jurors to be selected for a certain session.
In the stated session commencing September 12, 1966 we have four thousand people listed on the petit jury master list as compared with three hundred on the grand jury master list. I believe the evidence shows that the petit jury master list has increased since then because of the increase in the number of judges in the court house and the need for additional petit jury panels. Offered as an exhibit by the defendant is an occupational analysis, this is J-13, of the eleven most recent Bergen County Grand Juries, to and including the first stated session of September, 1967, which shows sixty-six different categories of employment. However, various occupations may be embraced in some designations. For example, the business of builder may embrace the class of blue collar workers who are engaged in the building trade such as building craftsmen, brick layers, or carpenters. This list was offered by the defendant to show that there is an absence from the grand jury list of persons who might be classified or called blue collar workers, members of the factory class, factory working class, truck drivers, and various craftsmen in the non-white collar trades.
The defendant contends that from 1922 to 1965, when Spencer Wright served, there was only one Negro who served on a grand jury of Bergen County and that was a Mr. Morrow, who the defendant claims served at a time which by coincidence occurred around the time of the last attack in Bergen County on the composition of the Bergen County Grand Jury. I don't believe that was the last attack or that this was the only attack since that time. I believe there have been other motions in other cases prior to this one, between 1948 and today questioning the absence of Negroes on the grand jury. It isn't important whether there were other attacks or not. In 1965, a Mr. Wright served. I believe the record also shows that Roosevelt Brown of the New York Giants, a Negro, was drawn for the second panel of the third *535 stated session of September, 1966; but I don't believe he actually served because that second panel was not used. I think that explains why he was drawn but did not serve.
The Grand Jury list of the third stated session, September term, 1948 may have inadvertently gotten into the list of exhibits. I found it among the exhibits that I have. I'm not sure if it was intended to be an exhibit or not but it does describe  assuming it's a public record and then I can refer to it  I think we have a general stipulation that reference could be made to jurors or grand jurors of prior terms  it describes E. Frederick Morrow of Hackensack, a telephone or telegraph switchman. It says "tel. switchman." There is in evidence a statement of a prosecutor who was involved in the case of State against Van Lewis, Jr. and John David Parker, Bergen County Court of Quarter Sessions. This, I take it, was the case in 1948 where a challenge was made to the composition of the grand jury.
The stipulation of the Bergen County Prosecutor at that time was:
"(1) That the adult population of Bergen County, New Jersey, for the years 1920, 1930 and 1940 is as set forth and classified in the Fourteenth, Fifteenth and Sixteenth Census of the United States, respectively.
(2) That the number of Negro residents of Bergen County, New Jersey, during the period from 1920 down to and including the present time, who possess the qualifications of grand jurors prescribed by Revised Statutes, 1937, Section 2:85-1, bears substantially the same ratio to the number of white residents of Bergen County, New Jersey, possessing said qualifications as the total Negro population of Bergen County bears to the total white population of Bergen County during said period.
(3) That from the period 1922 to and including the present time, no person of the Negro race has served on any Bergen County grand jury."
The accuracy of that stipulation has not been questioned in this case nor has independent evidence been offered to show that, except that Miss Nina Anderson testified that she was with the Bergen County Grand Jury Commission for over forty years and I believe she said to her recollection *536 there was no Negro juror on the grand jury in that period of time except for Mr. Morrow in 1948 and except for Negroes who have more recently served. The contention of the defendant is that the grand jury as composed violates his rights and violates the statutes of New Jersey because of alleged systematic and intentional and purposeful exclusion of Negroes from the Bergen County Grand Jury.
The defendant points to the occupational characteristics of those grand jurors who have served and contends that the disproportionate number of people who are engaged in professions of white collar type work  there are many persons of professional background and training and persons who have occupations or various professions such as accountants, nurses, pharmacists, pilots, veterinarians, economists, if we call all of these things professions  they comprise a large portion of the grand jurors who have served  he contends that the persons in the laboring class or the daily wage worker type of class have not been selected for service in the grand jury. I'm not certain if the defendant contends that this may be the means or one of the means by which subtly Negroes are excluded from service, possibly on the theory that a greater proportion of the Negro population is engaged in occupations not selected for service on the grand jury.
In any case, the defendant contends that the absence, the persistent absence of Negroes from grand jury service, together with the occupational composition of grand jurors, represents a systematic, intentional and purposeful discrimination, that the composition does not properly reflect all classes of the community as a whole, that the grand jurors are not properly representative of the community as a whole; and that therefore the defendant's rights have been violated.
I will deal with the contention that Negroes have been systematically, intentionally and purposely excluded from the grand jury.
Most of the cases in other states that have dealt with this problem deal with areas or communities where the Negro population represents a large section of the population as a *537 whole. Some of the cases cited by the defendant show this. I believe this was the case, I don't have these cases in front of me, but I believe this was the case in Labat. I believe that was a Louisiana case where the Negroes composed 32% of the community as a whole. I think the Rabinowitz case also was a case in that category. Labat v. Bennett, is in 365 F.2d 698 (5th Cir. 1966); Rabinowitz v. United States is 366 F.2d 34 (5th Cir. 1966).
In our case the statistical absence of Negroes, considering the population of Negroes compared with the population as a whole, in my opinion does not establish a purposeful, intentional discrimination. That is to say the fact that more Negroes have not served on Bergen County grand juries does not establish from a statistical viewpoint the inference of purposeful, intentional, systematic discrimination. The evidence shows that in 1960 2.24% of the population of Bergen County was non-white. Exhibit J-21 shows that in 1967 Bergen County has a total population of 895,485. In Bergen County in 1967 J-1 shows that approximately 16,531 people were of the Negro race. They apparently are centered mainly in six municipalities, Englewood, Hackensack, Teaneck, Rutherford, Ridgewood, and Westwood. The breakdown of their distribution shows 7,613 in Englewood; 4,450 in Hackensack; 1,955 in Teaneck; 450 in Rutherford; 310 in Ridgewood; and 490 in Westwood. This population incidentally compares with the total population in the various municipalities as mentioned in the exhibit. The Englewood total population is 27,138. As I said, 7,613 are Negroes. Hackensack has a population of 34,654 of which 4,450 are Negroes. Teaneck has a population of 42,970 of which 1,955 are Negroes. Rutherford has 21,058 with 490 Negroes. Ridgewood has 26,302 with 310 Negroes. Westwood has 27,408 with 450 Negroes. The total number of registered voters is as follows: Englewood, 13,751; Hackensack, 14,397; Teaneck, 22,735; Rutherford, 11,181; Ridgewood, 14,265; and Westwood, 5,369. This exhibit, J-1, was offered by the State to show that there are approximately *538 6,000 registered Negro voters in the county. This represents 1.4% of the entire voting registration list of the county. I believe the total number of registered voters in the county is currently 457,000. I think the record somewhere shows that figure.
Now, the relevance of the percentage of registered voters appears when we consider the system by which prospective jurors are selected in the county. The registration list as I said is a large list. Incidentally, the estimate of the total number of Negroes in the county over 21 is 10,760. So that 6,000 registered Negroes would represent a little less than 60% of the total estimate of the number of Negroes over 21 and this compares with the total registration in the county of 457,000 as against almost 900,000 people in the county at large, or roughly 50%. So that roughly 50% of all the people in the county are registered. However, that figure is not 50% of all the people able to register. The number of people in the county over 21 is certainly less than the total population. So, the total registration of 457,000 may indicate a higher percentage of whites registered who are qualified to register than Negroes registered who are qualified to register. I started to say that the significance of this is that the jury commission uses the registration list as a basis and their principal source for prospective jurors in the county. The statute  there is a statute which authorizes the jury commission to have access to this list  N.J.S. 2A:70-4 provides:
"For the purpose of making up the jury lists, the jury commissioners shall have access to and may copy the assessment rolls and registry lists of the several municipalities and election districts of their county."
The statute that prescribes the qualifications of jurors is N.J.S. 2A:69-1:
"Every person, male and female, summoned as a grand juror, and every petit juror returned for the trial of any action of a civil or *539 criminal nature in any of the courts of this State, shall be a citizen of this State for at least 2 years; over 21 and under 75 years of age; a resident of the county from which he shall be taken; shall not have been convicted of a crime; and shall not, at the time of his selection, be a person who through his office, position or employment is either directly or indirectly connected with the administration of justice. Such person shall be able to read, write and understand the English language and shall not have any mental or physical disability which will prevent him from properly serving as a juror."
It is certainly reasonable for the jury commissioners to use the registry list to get a large group of people who would fit at least prima facie the qualifications set by the statute. To start with our voting age is 21; so the voting registry list would begin with all of the people who were 21 and older. I might mention that there was testimony that the jury commissioners sometimes have placed on the jury list people whom they have personally known, and they have also on occasion obtained recommendations. More recently, beginning with the tenure of Morris Pashman as Assignment Judge of this county, an effort has been made to seek out names of Negroes who in the opinion of the jury commissioners would be qualified to serve as grand jurors and for that purpose names were obtained from some judges. Ultimately, as one of the exhibits shows, the jury commission wrote letters to various organizations, including Negro organizations in the county, in order to solicit names of prospective jurors. I mention this only to indicate the other sources from which prospective jurors are obtained. There is no evidence that assessment lists or rolls were used. Directories were not generally used. Prior to December of 1966 when Judge Pashman became Assignment Judge there was no effort made to communicate with organizations interested in Negro affairs to solicit names of prospective jurors. I believe that Mr. Callazuol did testify that he asked some friends of his who were Negroes for names, and apparently that's how Spencer Wright came on the grand jury. He was known to the jury commissioner. His name was included in the master list. Ultimately he was selected as one of twenty three from that list.
*540 To start with then the search for jurors begins primarily with the registry list, the list of registered voters. As I've indicated it appears that only 1.4% of the total registration list of the county are Negroes.
Now, dealing with grand jurors, we have twenty three people in our state comprising the grand jury. Three grand juries are usually empanelled each year. If pure statistics would be used and we assume enough chances mathematically to produce a uniform result, 1.4% of all the grand jurors would be Negro. Even if we use the percentage of non-white in the county of 2.2% and apply that to the twenty three grand jurors we would come out with approximately .5 grand jurors for every grand jury who would be Negro or one grand juror for every two grand juries. 2.2% of 46 grand jurors would produce one Negro grand juror. 1.4% would probably mean we statistically should have one Negro grand juror for every four grand juries.
Now, the record shows we have not had even that percentage of grand jurors who are Negro. The question is whether we can infer from these statistics purposeful, and intentional, systematic discrimination through the elimination of Negroes. Up to 1948 a different system was used apparently in testing the qualifications of jurors. The prospective jurors were summoned in and examined. In that fashion it could be ascertained to some extent at least who were Negroes and who were not. Since 1948, the period that we are primarily concerned with, a different system was used. In 1947 New Jersey got a new constitution and our court system was reorganized. The testimony was from one witness that under Chief Justice Vanderbilt the questionnaire started to be used. We have a questionnaire in evidence, as J-3. It is a form prescribed by the Supreme Court. It is sent out to all prospective jurors, and when returned it is examined for qualifications and exemptions. I might note at this time that our statute (N.J.S. 2A:69-2) provides for certain exemptions:
*541 "The following persons shall be exempt from service on any panel of grand or petit jurors:
a. Members or employees of police forces, State or local.
b. Members of any fire department or fire patrol, volunteer or paid.
c. Persons appointed as fish and game wardens or protectors.
d. Regularly licensed and practicing physicians and dentists in this State.
e. Members of State or Federal military, naval or air forces.
f. School teachers while their schools are in session.
g. Any person who has the actual physical care and custody of a minor child and who gives written notice to the jury commissioners of the county of his residence that jury service would interfere with the care required for such child.
h. All officers and persons regularly employed by any agency under the authority of the State Board of Control of the Department of Institutions and Agencies, or regularly employed by hospitals.
i. Telegraph and telephone operators and linemen and those directly engaged in the business of receiving and transmitting messages by telegraph or calls by telephone.
j. Any person who is the holder of an exempt firemen's certificate * * *."
The questionnaires come back filled out by prospective jurors giving various information called for. You might note that in the manual for the jury commissioners which contains a sample questionnaire the number and street, municipality, and county are provided for but there's no provision for the ward. So that when these questionnaires come back they do not show the ward in that municipality in which an individual lives. I believe the testimony shows that in Bergen County there are seventy municipalities but only three that are broken down into wards. Englewood, I think, Hackensack, and Garfield. This is mentioned because the defendant has also contended that the jurors have not been selected with regard to the wards in which they live as required by statute. This is the defendant's contention. It points to N.J.S. 2A:70-1 which provides as follows:
"The jury commissioners of each county shall, at least 40 days prior to the commencement of each stated session of the Superior Court in their county, make 2 lists, alphabetically arranged and consecutively numbered, of persons liable to jury duty, having regard to the just distribution of jury service among those persons qualified therefor in the various wards and municipalities of such county. The lists *542 shall state their occupation and places of abode, showing their respective municipalities and wards, if any, in municipalities, and shall be designated respectively the "grand jury list" and the "petit jury list." The number of persons named on the grand jury list shall at no time be less than 125 nor more than 300, to be determined by the assignment judge of the Superior Court for the county. The number of persons named on the petit jury list shall at no time be less than 250, the number to be determined by such assignment judge. A copy of each list shall be delivered forthwith to such assignment judge. The board of chosen freeholders of any county by resolution may provide for the purchase and use of the jury commissioners of the county electromechanical devices commonly designated automatic business machines with punch cards and card sorting machines."
In this county presently the jury commissioners prepare lists that show name, address, and occupation of the prospective jurors on the master lists, but the list is not broken down into wards.
Getting back to the questionnaire. These questionnaires are sent out to prospective jurors. They are returned and screened in order to determine minimal qualifications as required by the statute. They must be able to read and write English. Other aspects of qualifications for potential service are checked. The testimony is that ability to read and write English is judged to some extent by the degree of education of the person as indicated on the questionnaire. Someone without a grammar school education would probably be disqualified for lack of minimal educational qualifications. After the questionnaires are examined they are then placed in boxes in the order, more or less, in which they come in. They come in in large numbers. The evidence indicates that at times 20,000 questionnaires are sent out in a group and that the number of jurors available for service is depleted approximately three times a year. There are approximately three such mailings each year to keep the surplus files sufficiently full to furnish the needs for jury service in the county. These questionnaires are then taken by the jury commissioners.
Now, under the law we have two jury commissioners appointed by the Chief Justice of the Supreme Court. At the present time we have only one serving, Mr. Callazuol. Mr. *543 Sproat who was the last other jury commissioner was retired because of age. He has not testified in this case. I believe he was the other commissioner at the time that this indictment was handed down. Mr. Sproat and Mr. Callazuol in turn went over each of these questionnaires. Where some question may be raised as to the exempt status of an individual they would pass upon those questions. They marked those questionnaires to indicate those who would go in the grouping that has been referred to as the surplus file for prospective petit jurors and those who would go into the surplus file for prospective grand jurors.
Now, the jury commission maintains a list of approximately 900 persons in the surplus file for prospective grand jurors. That is three times the number usually designated by the Assignment Judge in this county, namely 300, as the number of prospective grand jurors to appear on each master list. As indicated, there are three master lists prepared each year. The list of 900, however, does not change that greatly as these lists in evidence show. Under the instructions in the manual and I believe also by statute, these questionnaires are sent out every three years, and, therefore, the information is up to date as to a prospective juror. A grand juror who has actually served is disqualified from serving again for a period of one year, I believe by the statute. That's also contained in the manual of the Supreme Court. Because only sixty nine grand jurors serve each year out of 900 there is not that much turnover in the master list as administered by the jury commissioners. That isn't to say they could not do it another way. They could get a fresh list of three hundred each time the grand jury is selected, but they maintain a list of 900 which as I've indicated has been somewhat static. They replenish the list only when the need arises, when through a questionnaire someone is discovered to be no longer qualified, someone on the list may move out, and for those losses new prospective jurors are selected. I suppose it could be said then, once a random choice is made in the 900 and not too many Negroes turn up on the original 900, the chances for *544 Negroes turning up on the grand jury are not very great if the list is not going to be replenished frequently and in substantial numbers. This may account to some extent for the fact that you do not get the exact mathematical proportion of Negroes on grand juries.
With respect to the occupational breakdown we have no statistics in this case to show to what extent Negroes are engaged in any one of the 66 occupations shown on J-13 which represents most of the occupations of grand jurors in the last eleven grand jury master lists. I think there's no question that there are Negroes who are engaged in the occupations shown for persons in the master lists. I don't say the occupations have been selected and then people found to meet the occupations. People have been selected, they fall into various occupational categories. There is no question in my mind that there are also Negroes in those occupational categories. It's difficult to say to what extent the occupational selectivity, if there was occupational selectivity, affected the Negro complement on the grand jury. The testimony of the jury commissioner denies that occupations are used as an exclusive test for prospective grand jurors. I'll get to that in more detail later.
Since 1948 and the use of these questionnaires it is impossible for a jury commissioner to know whether a prospective juror is Negro or white, or a member of some other race. The questionnaire does not contain a reference to race. Personal acquaintance with some of the 20,000 people who answer these questionnaires in each grouping may indicate their race. Some hint might be found in their addresses. However, Mr. Callazuol said that he was not familiar with the fourth ward of Englewood; he doesn't live in that town. As indicated before, the questionnaires don't show the ward breakdown, although it might be discerned that a person from a given ward might be of the Negro race. The questionnaires would not give hint of that because ward breakdown is not shown. The testimony is that an examination of the questionnnaires is made by the commissioners and they *545 decide who would be good prospective grand jurors and who would be petit jurors. These cards are then sent back and filed by the office staff.
The filing system is roughly is follows. There are two major files, actually there are three  there's a struck jury list or at one time was a struck jury list. I don't think that list is being maintained currently. One file is for petit jurors and one file is for grand jurors. The questionnaires are divided among municipalities. The reason for that is that the statute as I've read it calls for distribution of jurors among the various municipalities of the county. So that particularly, for example, on the grand jury the Assignment Judge had determined the allocation so that at least one representative of the grand jury master list would come from each municipality, and then he apportioned the representation by population. According to the 1960 census, J-9 and J-10, one juror was allocated for each 2,500 names. I think they mean for every 2,500 people in any municipality they allocated one grand juror. To get a master list of 300 they allocated, for example, 9 to Englewood for 26,000 people, 10 to Hackensack, 15 to Teaneck, 8 to Rutherford, 9 to Ridgewood and so forth. There are several towns or municipalities, as the record shows, which did not have 2,500 people. Alpine had 921, Old Tappan had 2,300, and Rockleigh had 430, Teterboro had 22, Saddle River Borough had 1,776, and South Hackensack had 1,841. These municipalities were nevertheless given one representative on the master list of 300. That's a slight amount of over-representation. To give them the full number other towns with larger populations were deprived of fractions. I believe the key towns that we're concerned with where there is heavy Negro population received their full number of representatives although they may have lost part of their fractions. This is a problem of apportionment, a mathematical problem of apportionment, that results every time there is an apportionment. So these questionnaires are filed according to geography, according to municipalities. So that when, for *546 example, they are making up their list, their master list, and they need nine people from Englewood they can go to the surplus file of questionnaires and take the right number out.
The testimony was that these questionnaires are kept in chronological order. That is to say, after all these mailings the questionnaires come back. Once someone goes into this surplus file as a prospective grand juror his questionnaire stays there until it is taken out for one reason or another  for service or because of absence or death or other disqualification. As they are needed to make up this master list those names are taken from the older questionnaires in the file. There's some evidence to show that the files are a little mixed up now possibly because some new changes have been introduced so that the actual examination of the cards in some cases didn't bear out this testimony. But, nevertheless, I accept the testimony as evidencing the intent and practice of the office although in administrative processes some questionnaires may get mixed up and get out of order chronologically. For each questionnaire there is an I.B.M. punch card. The jury office has become mechanized, the selection of jurors has become mechanized by the use of I.B.M. machines and punch cards and sorting machines and so forth. That too is provided for by statute. These cards cannot be examined by an individual selecting them to discern any of the characteristics that may be significant; certainly, again, race does not appear on these cards.
When a grand jury list is required the commissioners through their representatives in their office, their administrative agents, take out the proper number of questionnaires to make up the master list allocated according to town. They then match the questionnaires with the I.B.M. cards. Those I.B.M. cards are now put aside and we have 300 potential grand jurors represented by I.B.M. cards. The actual random selection is made by a judge. I think it can be made by someone else in a clerical position or administrative position, but in practice in recent years I believe at least it's been made by *547 a judge. I have made that selection and I think the record shows that. These cards are mixed up. They are shuffled by the machine and then a judge will select 50 of the 300 for the first jury panel and another 50 for a reserve or alternate panel. Once the cards are selected they are then listed by the I.B.M. machine according to the first one selected. This list is not in alphabetical order. The list of 300 is an alphabetical list but the jury list of the grand jury of 50 from which 23 are selected is not an alphabetical list. It's a list according to the order in which these cards have been selected at random. The first 23 are the first 23 prospective grand jurors. On a given day in open court they are called after being summoned to court and they take their seats and the Assignment Judge asks them if they have any reason why they ought to be disqualified or want to be excused. Some are excused and the next person numbered on that list fills that spot until the 23 are selected. The Assignment Judge then designates the foreman and the deputy foreman. They are sworn in and charged by the Assignment Judge, and that becomes the grand jury.
Since 1948, because of the use of questionnaires and more particularly by the use of I.B.M. cards, the persons making the selection have no way of knowing from the records who are Negroes and who are white or who are members of any other race. I am satisfied that certainly from the point at which the cards are used it is an absolute fair and impartial and non-discriminatory random selection that is applied.
It is suggested by defendant that in making up the master list, then, in deciding who shall go on the master list some discrimination is used and that accounts for the absence of Negroes. I'm also satisfied that in the selection of 300 persons for the master list that there is no systematic, intentional and purposeful exclusion of Negroes. As a matter of fact, the testimony is that the jury commissioners themselves do not know how many people on the master list may be Negroes. They have no way of knowing; they would not know unless they had personal information concerning one or more *548 of the persons. In recent time, since December of 1966, particularly in early 1967 and thereafter the evidence shows that an effort has been made to obtain Negroes and put them on the list. Mr. Callazuol testified that he as a commissioner also made efforts even before that time to obtain names of what he considered prospective grand jurors and he did put at least one person on the list. I believe he also knew of Roosevelt Brown, a Negro, and I believe he put Roosevelt Brown on the list too. Outside of those two individual instances I'm satisfied that the jury commissioners did not know who among these people were Negroes. The records of the office certainly do not indicate that.
Now, there has been testimony that Negroes appear more frequently on the petit jury list, or at least when they are brought in some are recognized as being Negroes. Of course, you're dealing with a much broader sampling. The fact that they appear on the petit jury panels does not in my mind prove factually that there is intentional discrimination or systematic exclusion of Negroes from the grand jury. I conclude therefore that as a matter of fact the evidence offered by the defendant, the evidence in this case, does not establish intentional, systematic, purposeful, exclusion of Negroes from grand jury service in Bergen County. Notwithstanding what has gone on in the past, the evidence shows that efforts are being made to obtain persons known to be Negroes and to put their names on the master list so that there will be a better chance of their names being selected as one or more of the 23 who actually serve.
Some criticism has been made by the defendant of the fact that this new procedure departs from random selection. I don't think that has to be dealt with in this case because it does not seem to have been a practice greatly used at or prior to the time when the particular grand jury was empanelled that indicted the defendant.
The manual for jury commissioners does refer to methods of securing names of prospective jurors. On pages 10 and 11 the manual provides:
*549 "As the word `selection' indicates, the process of choosing jurors in not an arbitrary or mechanical function, but a task requiring the exercise of judgment, discretion and good faith on the part of the jury commissioners in whom the primary responsibility for selection is vested.
Obviously it would be unfair, unwise and contrary to the intent of the statute if all jurors were selected from a few communities while eligible persons in other communities were denied consideration."
I think there was evidence in the case that people do sometimes volunteer to serve as jurors and they are sent questionnaires and their questionnaires are then dealt with by the jury commission. This manual also says as follows on page 11 that:
"The choice of specific sources in each county must necessarily be left to the discretion of the jury commissioners, acting with the advice and under the direction of the assignment judge in the county, because of the recognized and inescapable differences in local conditions among the twenty-one counties. In any county, however, the selection should be controlled by the following considerations: (1) all names should not be selected from the same source; (2) sources should be so coordinated as together to include all wards and municipalities in the county; (3) sources should be included which are likely to produce the names of persons possessed of intelligence, morality, integrity and common sense; (4) economic and social status, including race and color, should be considered only to the extent necessary to assure that there is no discrimination on account of them; (5) political affiliations should be completely ignored; and (6) unsolicited requests of persons who seek to have their names placed on the jury lists and unsolicited recommendations of names should be accepted with extreme caution."
I mention this only to indicate that under state law there is no infirmity in using specific sources of prospective jurors such as recommendations, nor is any constitutional issue posed by that method of selection. See Brooks v. Bato, 366 F.2d 1 (5th Cir. 1966), cert. denied, 386 U.S. 975, 87 S.Ct. 1169, 18 L.Ed.2d 135 (1967). Texas has only two stages:
1. The commissioners handpick 16 for the service;
2. The 12 man jury is chosen from the list of 16.
*550 I want to deal briefly with the contention that the failure to designate the wards on the master list is a violation of state law and should invalidate this indictment. In this respect, although the sample master list in the manual calls for a ward breakdown, in this county the jury commissioners do not use a ward breakdown for the master list. The Supreme Court, however, says, as to the requirement for ward distribution, at page 18 of the manual, the following:
"In making their selection of names from the file of active questionnaires the jury commissioners are subject to only two statutory restrictions. First, they are required to have regard to the just distribution of jury service among those persons qualified therefor in the various wards and municipalities within the county (N.J.S. 2A:70-1, as amended). This should not be interpreted as meaning that each ward and municipality must be proportionately represented on each list, but only that no ward or municipality should be intentionally denied representation. Second, no person who is otherwise qualified and deserving of selection should be passed over for reasons of race, color, creed, national origin or ancestry. To do so would constitute a misdemeanor. (N.J.S. 2A:72-7)."
There is no evidence here that persons were excluded by not using wards. It cannot be said on the basis of the record in this case that persons were excluded because of particular wards that they belonged to. The fact that the records don't show distribution by wards may assure a greater impartiality in distribution  however, not a greater certainty. For some reason the questionnaire form prescribed by the Supreme Court as I mentioned before does not contain a provision for wards. In counties where wards are an important part of a city, such as in Essex County where I believe Newark is divided into wards, it would be quite a burden for a jury commissioner to have to take all of the questionnaires and compare them for wards by streets and addresses. I don't say it's too much of a burden, but I merely point out that because the questionnaire does not call for it, there is imposed this additional work on the jury commissioner. In any case the failure to show a ward breakdown on the jury list I do not consider fatal under state law. *551 It would be if there were shown an intentional exclusion of wards or, particularly, if records were maintained showing wards and all those in a particular ward were excluded from jury service. Then you might draw the inference of improper selection on the part of the jury commissioners. However, the mere failure to list the ward breakdown is not fatal and in my opinion not a violation of a state law that would justify invalidating the indictment. Certainly the manual of the Supreme Court says that and I would be loath to criticize jury commissioners for following the policies expressed by the Supreme Court in the manual.
The last comments I have pertain to the complaint that persons of the wage earner class or blue collar working class do not appear on the grand jury lists that have been examined and analyzed. In J-13 there are some foremen, there are some draftsmen, clerks, people listed as builders, a telephone installer, a technician, someone in utilities, some secretaries, and the evidence indicates there are housewives also on the grand jury list. We don't know from the record who their husbands are. There is no question that occupations other than what might be referred to as the daily wage worker class do predominate in these grand jury lists. The question is whether this requires an invalidation of this indictment.
My original understanding of the attack made in the case was that it was an attack made on behalf of a Negro defendant who felt discriminated against because of the absence of Negroes on the grand jury. In looking over the master list, I considered to what extent the occupations shown there might be the cause of the absence of Negroes. In other words, what correlation could be drawn between these occupations and the absence of Negroes? To what extent does the occupational type result in elimination of Negroes? I don't think any conclusion can be drawn from the occupations as I have indicated before. I'm certain there are Negroes in many of these occupations, if not all of them. See Fay v. New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947). The designation banker as an occupation *552 doesn't mean that the person is the president of a bank. It could be a teller. They sometimes give their occupation as bankers. The same with builder. There is no evidence in the case to show statistically what number of Negroes in our county fall into these occupations as compared with whites. I don't think that any intentional exclusion of Negroes can be established because of the type of occupations shown on the grand jury lists.
The defendant has cited the Thiel case in support of defendant's claim that an intentional exclusion of a whole class is unlawful. That case was Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1945). That happened to be a civil case where the plaintiff jumped out of a moving railroad car and then sued the railroad for not supervising him more carefully, knowing him to be, as he put it, not in his normal mind. The attack was made that he was not given a fair trial because of jurors excluded from the jury. The Court was careful to note that the action taken by that Court was in the exercise of its administrative, supervisory powers over the composition of jurors in Federal proceedings. The Court said that the exclusion there required a reversal of the judgment below in the exercise of the court's power of supervision over the administration of justice in the Federal courts. The dissent of Mr. Justice Frankfurter points this out clearly. "No constitutional issue is at stake. The problem is one of judicial adminstration." 328 U.S., at p. 226, 66 S.Ct., at p. 989.
Our own Court in State v. Stewart, 2 N.J. Super. 15 (App. Div. 1949) refers to this fact in the Thiel case, at page 21. It talks of the Fay case, where the so-called blue ribbon jury in New York was sustained by the United States Supreme Court and a conviction upheld by a special jury in that case. The Stewart case talks of the state law with regard to exclusion of persons. At the end of the opinion at page 26, it talks of the democratic philosophy that jurors should be truly representative of our community as a whole. The Appellate Division said, at page 26:
*553 "We might, however, express the cautionary comment that officials charged with the high responsibility of preparing jury lists should be ever vigilant in vindicating our democratic philosophy that juries be truly representative of our community as a whole. This, of course, does not mean that each jury could or ought embody representatives of all groups. It does mean that each jury is to be selected without systematic or intentional exclusion of any qualified group and that whenever it appears that large segments of our population, fully qualified and not exempt by law, are not being called for jury service, whatever be the cause, corrective steps should be taken."
The evidence here shows that the jury commissioners, in selecting and designating those who may serve on grand juries as distinguished from petit juries, examine what they call the overall qualifications of the person, that they do consider their occupation, and they consider their education.
Last Friday an examination was made of cards of prospective jurors currently being used. Englewood cards, for example, indicate that persons on the grand jury list have a great deal of education. There was one person on the list with four years of high school education who was a project manager. Everyone else had three and a half or more years of college, one eight years of college, one graduate school. The people were housewives, salesmen, chemical engineers, technicians, I believe, and a clergyman. I don't have all the occupations listed in my notes. If that is some indication of the standards used by the jury commissioners then obviously they are holding to a high educational standard. In Hackensack, one questionnaire showed a B.S. degree with four years of college; the second one had a high school education and nursing school; the third one had four years of college and one year of law school; and the fourth one had five years of college. Undoubtedly more general standards of educational background are used to test the qualifications of the petit jurors. The question is whether the distinction apparently used by the jury commissioners represents an abuse of discretion and an unconstitutional abuse of the defendant's rights. It may be that a use of those high educational standards is *554 reflected in the occupational composition of members of the grand jury.
I think that legally in the discretion of the jury commissioners a higher education standard can be used for the selection of persons to serve on the grand jury. I'm not saying that efforts should not be made to have a representative group. However, I think the jury commissioners certainly can use standards above the bare qualifications of the statute, namely, they can look to more than the simple ability to read and understand English and look to more than the age requirement as such.
I think defendant conceded that some discretion can be accorded to a jury commissioner in qualifying a person for the grand jury. The defendant's contention is that we should not compose our grand juries to have a so-called elite group to decide who should be indicted and who should not be indicted. I'm not convinced that 66 occupations running from accountant to wholesaler represent an elite group. I'm not certain either that in looking at this problem that we have to accept the classification relied upon by defendant. For example, we may talk about broad economic or social classes. I'm not certain that these groups, that the grand jurors do not represent a fair cross-section of economic classes. In any case, if we allow more selectivity by using educational factors, the question is whether that will result in an abuse because it may produce persons of higher income, on the theory that higher education is correlated to higher income. If you accept the proposition that a higher educational standard can properly be used, if that is a valid standard, then you cannot accept the correlary that the use of a higher educational standard must produce intentional discrimination. If it's a permissible standard the results need not be stricken down as intentional, purposeful discrimination against some class or group.
There are some names on the list that may be recognized as names of prominent persons in the community. I believe Mr. Bernstein referred to a Henry Becton on one of *555 the lists as a member of the well-known Becton-Dickinson Corporation in this county. I believe Donald Borg, the editor and publisher of The Record, was on the list. Even if it were accepted that those names were chosen and placed there because they were recognized by the jury commissioners I would not find that their appearance on the list is justification for criticizing the composition of the grand jury, and certainly would not strike the grand jury down because of that. They may represent persons of recognized leadership in the community or parts of the community. But I think that the grand jury can be composed in such a way as to include these people even if they are selected from their respective towns to go into the master list. I don't find any unconstitutional invalidity resulting from that. The actions of the grand jury  while in a sense not more important to an individual that a conviction by a petit jury  the actions of the grand jury should inspire confidence in the community. The composition of the grand jury should represent impartiality and integrity and independence. These are factors that I think can properly be reflected by the presence of some community leaders on the grand jury. The grand jury in this state not only indicts, it also hands down presentments. Various procedures and rules pertaining to presentments in this state are found in the case of In Re Presentment by Camden County Grand Jury, 34 N.J. 378 (1961).
Presentments deal frequently with action of public officials. They fall short of indictments, but they frequently contain serious criticism of certain conduct of public officials or agencies. A grand jury should be composed of persons who have the intelligence not simply to indict in cases for which petit jurors may also convict, but the intelligence and integrity to make independent investigations for the purpose of presentments, to make recommendations such as in the study of traffic safety problems, recommendations for governmental action. It is hoped that the action of grand juries will command the respect of the community at large. This doesn't mean that we should disregard the need for impartiality in *556 the selection of grand juries and that we should only take recognized community leaders and intentionally exclude others. However, in terms of using a so-called education factor and seeking persons of higher education to some extent for grand jurors I don't find in that fact or that factor that there is constitutional discrimination.
I have one more comment before referring to the manual. The grand jury system today is under review, shall we say, and in some quarters is under attack. It has been suggested that we should do away with grand juries entirely. In this state we have a constitutional provision for indictment by grand jury for certain common law crimes. Article 1, par. 8 of the 1947 Constitution says:
"No person shall be held to answer for a criminal offense, unless on the presentment or indictment of a grand jury, except in cases of impeachment, or in cases now prosecuted without indictment, or arising in the army or navy or in the militia, when in actual service in time of war or public danger."
I believe that the constitutional right to indictment for common law crimes is as it existed in 1776 when the first constitution in this state was adopted.
As one of the witnesses indicated, in the grand jury process the grand jurors listen to only one side, and must use their own experience and wisdom and rational ability without the attorney for the defendant guiding them in their conclusions. Of course, the grand jurors do not convict; they merely indict, and the test is not the same as in a plenary trial. In any case, there are differences in responsibility performed by the grand juries as compared with the petit jury, and this difference I think can be recognized.
I started to say that the grand jury system is under attack, and it is suggested that we should do away with it entirely  this would require a constitutional amendment  because it is said that the prosecutor gets what he wants out of the grand jury anyway, meaning, he gets an indictment when he wants it and a no bill when he wants it. The *557 suggestion is that he can lead grand juries by the nose. So it is suggested that if that is so the prosecutor ought to take the responsibility for indicting on his own and not use the grand jury at all. This would be a drastic revision of our system. Others consider the power of the grand jury to exercise independence as one of the bulwarks of our system of justice and a great safeguard of the rights of individuals, so that one should not be indicted except where just cause is found by a jury and should not be held to face criminal proceedings simply on the complaint of one man, the prosecutor. However, the contest shows that there may be a problem here in terms of the relationship between the prosecutor and the grand jury. There has always been hope in this state, and I know having heard assignment judges charge grand juries, that grand jurors recognize the importance of acting independently and they are so charged. I believe our Court rules provide that grand jurors can ask the prosecutor to leave the room. It is hoped that they would exercise independent reflection and judgment in their activities. R.R. 3:3-6(a) provides.
"The prosecuting attorney, the clerk of the grand jury, the witness under examination, interpreters when needed and, for the purpose of taking the evidence, a stenographer or operator of a recording device may be present while the grand jury is in session, but no person other than the jurors, the clerk and the prosecuting attorney may be present while the grand jury is deliberating. The grand jury, however, may request either the prosecuting attorney or the clerk to leave the jury room."
R.R. 3:3-7 says: "The requirements as to the secrecy of proceedings of the grand jury shall remain as heretofore."
Obviously we are seeking qualified jurors. I don't mean to suggest in anything I say that you have to have a college education to be honest, to have integrity, to have good judgment, or to be able to act as a grand juror. At the same time I don't think the grand juries should be condemned simply because they contain many persons of high education. Perhaps our Supreme Court in its manual has gone even further *558 than I contemplated when thinking about this case. Here's what they say on pages 17 and 18:
"In selecting names for the grand jury and petit jury lists the jury commissioners should bear in mind the functions which the grand juries and the petit juries respectively will be called upon to perform: the grand jury determines whether indictments charging crimes shall be found and is empowered by presentment to call attention to delinquencies involving public affairs  in its hands rests to a large extent the responsibility for the maintenance of law, order and morality throughout the county; the petit jury is a trial jury which finds the facts in particular cases and applies thereto the law as enunciated by the judge  the verdict in the case before it may affect property rights, or liberty, or even life itself. The responsibility resting on the members of a grand or petit jury is great; the responsibility of the jury commissioners who select the persons who will perform such service is even greater.
In making their selection the jury commissioners must exercise their own sound judgment and discretion, to the end that the persons selected may be intelligent, sensible, honest, impartial and courageous. The commissioners must be absolutely impervious to outside influences, and should be careful not to select persons whom they have reason to believe are politically active, easily influenced, or of doubtful integrity."
It also says on page 7 of the manual:
"For centuries the jury system has been one of the keystones in the administration of justice both in England and in this country. In New Jersey the right to indictment or presentment by a grand jury and to trial by jury are vouchsafed by our State Constitution. Traditionally the persons who comprise the grand juries and the trial or petit juries are a part of the judicial establishment. Within their respective spheres of action, their work is fully as important as that of the judges who preside in our courts and the lawyers who practice before them.
The function of the grand jury is to determine whether indictments charging crimes are to be found and to call attention by presentment to delinquencies short of crime on the part of public officials or in public institutions. Quite obviously if justice is to be done in every case and the peace of the community consistently maintained, our courts must have the assistance of competent jurors who believe in their country and its form of government, who are honest and upright, and who possess the intelligence and sound judgment, the courage and impartiality that will enable them properly to perform their task and to do so without fear or favor.
*559 It is not enough, however, to have competent jurors serving in our courts. It is also essential that they be so selected that the public will have continued confidence in the integrity and impartiality of the jury system and its administration. The responsibility for the effectual accomplishment of this task of jury selection rests initially and primarily in the jury commissioners."
I know of no case in this state or elsewhere and none has been called to my attention where an indictment has been stricken or a conviction set aside because of the occupational groupings of members of the grand jury, except in two instances. One instance is evidenced by the Labat case where the result was to exclude disproportionate numbers of Negroes who would otherwise be serving as a grand juror. This is the case where there is a large Negro population and only token numbers are selected or allowed to serve on juries, and the method of accomplishing this is to exclude persons in those occupational categories that are largely comprised by the Negro class. In that type of case there have been findings of intentional, purposeful discrimination due to the elimination of certain groups in order to eliminate Negroes from juries. The other type of case is the Thiel case, where the jury commissioners admit that they intentionally excluded a certain group of persons, namely those designated daily wage earners.
Now, in this case, we have no testimony of any commissioner admitting that he intentionally excluded any particular occupation. What we have here is that the standards apparently applied, as I have indicated, give considerable weight to educational background, and this may tend to eliminate some occupations. Obviously if I were satisfied that this was a scheme used to exclude Negroes I would find intentional discrimination and I think other cases suggest the same. No method or device can be used which subtly accomplishes an invidious purpose. No system, I think Mr. Justice Black said, ingenuous or ingenious, can be used to accomplish such a purpose. I am satisfied as a fact in this case that this system whatever it is that the jury commissioners use, if *560 it is a uniform system at all, has not been designed to eliminate or exclude Negroes. Certainly at the time of this indictment Mr. Callazuol, who was one of the commissioners, has evidenced to me his good faith in having made some effort at least to reach out for one or more Negroes prior to the time that this grand jury indicted. I think that accounted for Mr. Spencer Wright's appearance on the grand jury in 1965. I don't think he can be charged with some ingenious scheme to eliminate Negroes from the grand jury by choice of occupations when the facts show some fair and honest effort on his part to include Negroes.
A similar problem was presented to the Supreme Court in the Fay case. Although general language concerning our democratic principles and fair representation appears in many subsequent cases I know of no case that has overruled the Fay case; and I know of no case that falls into the category of the case before this court where an indictment has been invalidated simply because members of some occupations were omitted from the grouping of 66 occupations in the grand jury list. In Fay you don't have a much different factual situation. There you have a statute for a special jury. In the Fay case an effort was made to screen prospective jurors before they served on a criminal petit jury. They were brought in and their races could be ascertained by their personal interview. The statistics show, in footnote 14 of that case, that of close to 3,000 special jurors on file in the New York County Clerk's office none fell into the class designated as laborers. Only five were in the class designated mechanics. The court indicated that some may be embraced in other categories, such as building, well, there is a category building and construction. But there were some other categories of other occupations that could include some of these people. The Court concluded that it is impossible from the evidence to find that the distribution of the jury panel among occupations isn't the result of the application of legitimate standards of selection. Only 30 women appeared in the special jury list, but there is a special exception for *561 women serving as jurors in New York. I think their service cannot be compelled, they have to be willing to serve. The Court itself referred to the fact that only in racial discrimination cases has the Supreme Court interfered with the composition of state court juries, except as in the Thiel case where in the exercise of supervisory powers the court acted.
The Court said:
"It is significant that this Court never has interfered with the composition of state court juries except in cases where this guidance of Congress was applicable. In an opinion by Mr. Justice Holmes it unanimously made short work of rejecting a claim that the Fourteenth Amendment prohibits the state from excluding from the jury certain occupational groups such as lawyers, preachers, ministers, doctors, dentists, and engineers and firemen of railroad trains." 332 U.S., at p. 283, 67 S.Ct., at p. 1625, citing Rawlings v. Georgia, 201 U.S. 638, 26 S.Ct. 560, 50 L.Ed. 899 (1906).
The Court in Fay said:
"We do not mean that no case of discrimination in jury drawing except those involving race or color can carry such unjust consequences as to amount to a denial of equal protection or due process of law. But we do say that since Congress has considered the specific application of this Amendment to the State jury systems and has found only these discriminations to deserve general legislative condemnation, one who would have the judiciary intervene on grounds not covered by statute must comply with the exacting requirements of proving clearly that in his own case the procedure has gone so far afield that its results are a denial of equal protection or due process. * * * It is fundamental in questioning the composition of a jury that a mere showing that a class was not represented in a particular jury is not enough; there must be a clear showing that its absence was caused by discrimination, and in nearly all cases it has been shown to have persisted over many years." 332 U.S., at pp. 283-284, 67 S.Ct., at p. 1625; 91 L.Ed. at 2057-58.
The Court in Fay held that the defendant has the burden of proving discrimination of an unconstitutional kind, that is to say, purposeful and intentional discrimination. The Court said that the Supreme Court has never entertained the objection except when the objector was a member of the *562 excluded class. "Relief has been held unavailable to a Negro who objected that all white persons were purposely excluded from the grand jury that indicted him," citing a particular case. I'm not certain how forceful that proposition is today under recent cases. But it is interesting that in Fay v. New York the Court considered the Thiel case, the Glasser case (Glasser v. United States), 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and the Ballard case (Ballard v. United States) 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946). The Court went on to say that the facts in the present case are distinguishable in vital and obvious particulars from those in any of these cases, saying:
"But those decisions were not constrained by any duty of deference to the authority of the State over local administration of justice. They dealt only with juries in federal courts. Over federal proceedings we may exert a supervisory power with greater freedom to reflect our notions of good policy than we may constitutionally exert over proceedings in state courts, and these expressions of policy are not necessarily embodied in the concept of due process." 332 U.S., at p. 287, 67 S.Ct., at p. 1627.
The Court concluded that the defendant "has no constitutional right to friends on the jury." Notwithstanding the statistics that I mentioned above, the Court said with respect to the complaint that certain economic groups were excluded, namely, laborers, craftsmen and service employees, that at most the proof showed lack of proportional representation and "there is an utter deficiency of proof that this was the result of a purpose to discriminate against this group as such." The Court said that not having jurors of the same economic group does not prove that defendant has been prejudiced, particularly since people tend to fall into so many different economic groups and their interests are not necessarily competing. The Court said that "we are not ready to assume that these differences of function degenerate into a hostility such that one cannot expect justice at the hands of occupations and groups other than his own. Were this true, an extremely rich man could rarely have a fair trial, for his *563 class is not often found sitting on juries." The Court also said: "Nor is there any such persuasive reason for dealing with purposeful occupational or economic discriminations if they do exist as presumptive constitutional violations, as would be the case with regard to purposeful discriminations because of race or color. We do not need to find prejudice in these latter exclusions * * *. But as to other exclusions, we must find them such as to deny a fair trial before they can be labeled as unconstitutional."
I don't know to what economic class Mr. Rochester belongs. It's fairly obvious that if he is a youth as suggested by Mr. Bernstein that he is not 21 years of age and therefore has no representation at all by his age group on any jury. When we draw classifications obviously discretion is accorded to the states under the Federal Constitution and in this state to jury commissioners. The discretion has to be exercised within certain limits. It cannot be exercised in a manner to intentionally discriminate against a particular member of a class or race. But, considering the issue of prejudice, the fact is I believe that the greatest economic competition between whites and Negroes lies among members of the same economic class. I think the majority of people are not in the rich class, and the greatest competition in society today between whites and Negroes is among those who are competing for the same jobs. That the Negro does not have a fair chance to have fellow Negroes on the jury I think as the Court in Fay said may imply prejudice without having to establish it clearly. But that he is prejudiced by not having whites of exactly the same occupation or exactly the same economic level on the jury does not necessarily mean he is prejudiced. The greatest competition appears to be for housing and employment on the same levels. I don't say that Mr. Rochester should be thankful that more "poor whites" are not on this jury. I don't know how many "poor whites," if any, were on the grand jury that indicted him. But in terms of prejudice I don't think that we should conclude that the absence of a laborer on the grand jury would *564 be prejudicial to Mr. Rochester, a Negro. Of course, trying to prove such a point does tend to justify the general rule that selection should be made without intentional discrimination for or against a given class. Impartiality in the administration of laws should be achieved. But as I said there is discretion which could be afforded and must be afforded jury commissioners. Except in the case of an abuse of discretion an indictment should not be stricken. In the Fay case I think the Court felt some reluctance to set aside the conviction. The Court pointed out that the system of selection of juries had been in existence for a long time in New York and I think by then at least one hundred persons had been convicted of murder by special juries. I found in that comment by the Court some evidence that the Supreme Court would be loath to find the need to invalidate such a conviction with the consequences that it might have on other cases and other convictions.
For the foregoing reasons I find that the defendant has not established on the facts in this case an intentional, systematic and purposeful discrimination, nor that the grand jury that indicted the defendant was improperly constituted so as to result in a violation of defendant's Federal constitutional rights, nor his rights under state law.
I don't say that more cannot be done by way of administration and supervision. The Assignment Judge has the authority, and the evidence in this case shows that he is exercising that authority to make changes to assure a broadening of representation of jurors serving on the grand jury of this county. I think improvement can be made. However, I feel that this is a matter for administration that the state can exercise; and the facts here do not demonstrate defects which rise to the level of violating defendant's Federal constitutional rights.
Defendant's motion will be denied.