**UNITED STATES of America ex rel. Horace LAWS, Appellant,**

v.

**Howard D. YEAGER, Principal Keeper of the New Jersey State Prison at Trenton, New Jersey.**

**No. 18162.**

United States Court of Appeals, Third Circuit.

Argued Nov. 4, 1970.

Decided March 31, 1971.

As Amended on Rehearing Aug. 30, 1971.

Charles W. Heuisler, Camden, N. J., for appellant.

Edward N. Fitzpatrick, Asst. Prosecutor, Bergen County, Hackensack, N. J. (Robert Dilts, Bergen County Prosecutor, Hackensack, N. J., on the brief), for appellee.

Before BIGGS, VAN DUSEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

This is an appeal from the denial by the United States District Court of Laws' petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Laws was indicted, along with others, for conspiring to commit armed robbery in violation of N.J.S.A. 2A:98–1 and 2A:98–2 and to commit murder in violation of N.J.S.A. 2A:113–1 and 2A:113–2. He was convicted of murder in the first degree and sentenced to death pursuant to N.J.S.A. 2A:113–4. He was also convicted on the conspiracy charge but sentence was suspended. On appeal, the New Jersey Supreme Court affirmed the convictions but found error in the imposition of the death sentence. State v. Laws, 50 N.J. 159, 233 A.2d 633 (1967). On reargument the New Jersey Supreme Court modified the sentence to life imprisonment. State v. Laws, 51 N.J. 494, 242 A.2d 333 (1968). The United States Supreme Court denied certiorari, 393 U.S. 971, 89 S.Ct. 408, 21 L.Ed.2d 384 (1968).

The facts are set forth accurately in the first opinion of the New Jersey Supreme Court as follows:

"During the early morning hours of April 26, 1965 there was an armed robbery at the Public Service Coordinated Transport's terminal garage in Oradell. Christopher Jaeger, a Public Service bus driver, was killed by pellets from a shotgun fired by one of the robbers. The State's evidence as to the robbery was quite detailed but need only be summarized here. At about 3 A.M. three men entered the Oradell terminal. They wore ski masks which covered their heads and had openings for their eyes and mouths. They also wore flesh colored surgeons' gloves. Two of the men were short and the third was tall. The short men carried revolvers and the tall man carried a shotgun. The tall man did most of the limited amount of talking. He spoke with a southern drawl and, while there had been earlier variations in their descriptions, the witnesses at the trial generally agreed that he was brown or dark complexioned. The short men were invariably described as Negroes.

"The robbers herded several of the Public Service employees into the cashier's office. There they handcuffed Ellis, a maintenance man, Elliott and Grie-

ner, bus drivers, and Jacobus, a bus driver who had been temporarily assigned by Public Service to duties as cashier and depot master. The employees were forced by the robbers to lie side by side on the floor of the cashier's office and their mouths and eyes were covered with white adhesive tape. The robbers then proceeded to empty the safe in the cashier's office. The safe had been open and had contained between 20 and 25 bags of money. After the robbers left the cashier's office, the employees heard a loud bang and then heard an automobile starting up and driving off. It sounded to them like a 'souped-up car or a hot rod.'

"The handcuffed employees managed to push a button which sounded an alarm in other portions of the terminal garage. In response, Quinones, a Public Service mechanic, ran in. He announced that Jaeger had been shot and asked that the police and an ambulance be called. In due time the police arrived and found Jaeger's body lying in the garage. A doctor connected with the Bergen County Medical Examiner's office also arrived and ordered the body removed. He performed an autopsy which disclosed that shotgun pellets and wadding had entered the brain. Although the exact amount taken by the robbers was not known at the time of the event, later investigation established that they had stolen $20,512.-60. Of that amount approximately $10,-000 was in single dollar bills, $2,000 in bills of higher denominations, and the rest in coins except for about $1,000 in checks.

"During the early evening hours of April 26th, one Dennis Kingsley was at the Spring Valley, New York, station house talking to Chief of Police Kraniac. Dennis was asked about a burglary at Gattuso's Service Station in Spring Valley and Dennis gave some indication that it had been perpetrated by his older brother Joseph Kingsley and one Peter Kostas. Dennis first inquired whether there had been a big robbery in Bergen County, New Jersey, and later told Chief Kraniac that he knew about its planning.

The Bergen County Prosecutor's office was called and shortly thereafter Dennis accompanied two representatives of the prosecutor's office to the Oradell police station. He made statements which were followed in New York by the issuance of search warrants and the search of several apartments including those of Laws and Washington. Thereafter the Bergen County Grand Jury returned separate murder indictments against Laws, Washington, Austin Baker, Joseph Kingsley, John Doe, and Richard Roe. A conspiracy indictment was returned against all of the aforementioned except Joseph Kingsley. Later the indictments setting forth the name of John Doe were amended to substitute the name of Julian Smalls in its stead.

"At the trial, Dennis testified to the following effect: His brother had worked at the Oradell terminal and had told him that it would be 'an easy place to knock off.' About mid-April 1965 he and his brother were at the apartment of the defendant Laws who was known generally as 'Hap.' The defendant Washington was also there along with some other men. Dennis saw his brother and Hap leave the living room to talk privately. On Sunday, April 18th, Dennis went to Laws' apartment looking for his brother. Laws told him that his brother had been arrested for 'a safe job in Spring Valley.' While Dennis was in the Laws' apartment, Washington and two other men came in. One of these men was Smalls. Smalls complained about his gun and Dennis offered to get a gun from his brother's hotel room. Laws then gave Washington the keys to his Plymouth automobile. Dennis, along with Washington and Smalls, went to the hotel but could not find the gun. They returned to the Laws' apartment and then Washington left for a few minutes and came back with an old single-barreled shotgun. Washington had five or six red and green shotgun shells.

"Laws showed Washington how to load the shotgun, then went into the bedroom and brought out a green duffel bag. He opened the bag and took out three ski

masks. Dennis described one as predominantly red with blue stitching. Dennis also saw Laws take out three pairs of flesh-colored surgeons' gloves. At that point Laws left the apartment saying that he was going to get Austin Baker's car. Laws returned to the apartment shortly and, about two in the morning of April 19th, Washington, Smalls and an unnamed person described by Dennis as a truck driver, left with Laws wishing them luck. At about 3:30 A.M., the telephone in Laws' apartment rang and Dennis heard Laws say that he was glad it happened on the way there and not on the way back. At about 4:30 A.M. the three men returned telling Laws that their car had gone dead.

"There was independent testimony corroborating the breakdown of the car and the telephone call to Laws' apartment. Mr. Felice, an employee of Comfort Cab, Inc., testified that about 3 A.M. on the 19th, three Negroes (Washington, Smalls and the truck driver were Negroes) came to his office on Kinderkamack Road in River Edge to get help because their car had broken down. An attempt at jump-starting the car was made by an employee of the Cab Company but was unsuccessful and the men returned with him to the office and made a telephone call. The records of the New Jersey Bell Telephone Company established that at 3:49 A.M. a call was made from Comfort Cab to AU 6–7324 which was the number of the telephone in Laws' apartment. When Laws testified in his own defense he acknowledged that Dennis was at his home on April 18th but denied that he stayed at the Laws' apartment through the night. Laws testified that Dennis left by about midnight and that the telephone call received by him in the early morning hour was a call to him from Dennis.

"Dennis testified that at 7:30 A.M. on Monday, April 19th, he, along with Washington, Laws and Baker, drove in Laws' Plymouth to a side street of Kinderkamack Road, River Edge. There they pulled up in front of Baker's Oldsmobile. Washington then took a green duffel bag from the trunk of the Oldsmobile and placed it in the trunk of the Plymouth. Dennis succeeded in starting the Oldsmobile and they all then drove back to New York. Mr. Rush, a resident of River Edge, testified that he saw a car which he later identified from a photograph as the Plymouth, pull up to the Oldsmobile which had been parked beside his driveway. He said that he saw four men, one of whom was white and the others colored, standing between the cars. Austin Baker, who testified that he had loaned his car to Laws without knowledge of its intended use, stated that he had gone with Dennis, Laws and another Negro to New Jersey to bring back his Oldsmobile. Baker and Laws, as well as Washington, are Negroes and Dennis is white.

"Dennis testified that about noon on April 19th he went with Washington and Laws to a pawnshop at 145th Street and Eighth Avenue in New York City. Laws pawned a ring for $30 and Washington pawned a watch for $3. Laws acknowledged that he was in the pawnshop but denied that he had gone there with Dennis and Washington. He testified that as he was leaving the pawnshop he saw Washington there. The proprietor of the pawnshop testified that the pawn tickets issued to Laws and Washington were numbered 18781 and 18782, indicating consecutive transactions. The pawnshop was open from 9 A.M. to 6 P.M. and on the day in question there were 46 transactions prior to and 200 subsequent to those of Laws and Washington.

"During a search of Laws' apartment on April 27th, various items were seized by the police officials. They included a green duffel bag, .38 caliber cartridges, a lady's handbag, a brown valise, and $2,784 in United States currency. Most of the currency was found in the valise and handbag and some was found in a dresser drawer and along a window sill. Almost all of the currency was in single dollar bills. Some of these bills contained markings which were unequivocally identified by four Public Service cash-

iers, namely Jacobus, Hill, Mattson and Hanson, as their own individual markings. In addition, the State presented testimony by a handwriting expert that the markings were made by the same hands as those on samples identified as having been made by the cashiers.

"During a search of Washington's apartment on May 1st, the officers found 533 single dollar bills under a mattress, 48 single dollar bills in a dresser drawer, and a piece of paper with the telephone number of Laws and the name 'Hap' after it. The officers also found a letter to Washington bearing the return name and address of Margie Stevens, 209 West 147th Street, New York City. The officers later went to that address, saw Washington lying there in bed, searched the apartment, and seized 259 single dollar bills. Margie Stevens stated that the bills were not hers. The Public Service cashiers unequivocally identified some of them, as well as some of the bills seized in Washington's own apartment, as bearing their own individual markings.

"In describing how their markings occurred, the cashiers testified that it was their practice to receive bills and coins from the bus drivers as they arrived at the terminal garage. The coins were counted by machine but the bills were counted by hand. The bills would be piled in lots of 50 and rubber bands would be placed around them. When the amount received from the driver was less than $50, the top bill would be marked with the temporary total and, when another driver came in, the pile would be supplemented by a sufficient number of bills to total $50. The markings were placed by each cashier in his individual fashion and none of the cashiers evidenced any hesitancy in identifying his own markings.

"No purpose would be served by lengthy discussion of the additional tes-

timony introduced by the State although some of it may be mentioned in passing. Two Public Service employees identified Laws' Plymouth as the car they saw cruising around the Oradell terminal between 10 P.M. and midnight on April 22nd, several days before the robbery. The Public Service cashiers identified several small red metal caps, which were found in Laws' Plymouth after the robbery, as coming from or being similar to the caps attached to the money bags stolen during the robbery. A firearms expert testified that the pellets and wadding taken from Jaeger's body came from Remington shells similar to those seized in Laws' apartment. And a police expert testified as to the meaning of the 'street talk' used in a highly incriminating note written by Laws while he was in custody after the robbery. Laws acknowledged the writing of this note but denied that it related to the robbery or the distribution of the proceeds thereof.

"The defendant Washington did not testify in his own behalf but did present testimony through witnesses which included Margie Stevens. She said that he was with her at her apartment in New York during the morning of the robbery. The defendant Laws testified in his own behalf and denied all knowledge of or participation in the robbery." 50 N.J. at 165–171, 233 A.2d at 636–639.

In his petition for a writ of habeas corpus, Laws lists six separate grounds on which he claims he is being unlawfully incarcerated. We now address ourselves to each of these grounds.

## I. Right to a Public Trial

■■ During the course of Dennis Kingsley's cross-examination, he requested the court to remove his mother from the courtroom during his testimony.[1]

---

1. The following colloquy transpired:

"The Court: A few minutes ago, gentlemen, the witness advised me that the presence of his mother inhibits his testimony.

"He requested that I remove his mother during his testimony.
"Prosecutor, you made that as a motion before.
"Mr. Galda [prosecutor] : I made the motion some time ago.

The Judge complied with this request stating that the presence of Dennis' mother inhibited Dennis' testimony. Laws argues that the ouster of Dennis' mother constituted a denial of Laws' right to a public trial in violation of the Sixth Amendment.[2] With this contention we cannot agree.

The requirement of a public trial required by the Sixth Amendment has been incorporated into state court proceedings by the Fourteenth Amendment. United States ex rel. Bennett v. Rundle, 419 F.2d 599, 604 (3 Cir. 1969); Estes v. Texas, 381 U.S. 532, 559–560, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (Warren, Chief Justice, concurring). This requirement is not absolute in the sense that a defendant has the right to have any particular person present under all circumstances during the course of the trial. "There is general agreement that spectators having no immediate concern with the trial need not be admitted in such numbers as to overcrowd the courtroom and take up room needed for those who do have special concern with the trial such as the court officers, jurors and witnesses, and the relatives and friends of the defendant. Moreover those spectators who are admitted must observe proper decorum and if their conduct tends in any way to interfere with the administration of justice in the courtroom they may, of course, be removed. Likewise there is agreement that in cases involving sexual offenses youthful spectators may be excluded when the

"The Court: How about you?

"Mr. Bertini [counsel for Laws]: I have no objection.

"Mr. Monaghan [counsel for Washington]: Judge, I object very much on the ground that I don't know what he means by inhibits his testimony.

"The Court: I used the word inhibits.

"Mr. Monaghan: Whatever he is saying, I think his mother—

"The Court: He told me he would like to testify without his mother's presence.

"Mr. Monaghan: I want to make it clear—

"The Court: And you are objecting.

"Mr. Monaghan: I want to make it clear why, Judge.

"I think the mother naturally is very interested in this trial because her other son Joseph Kingsley is under indictment for the same crime charged here, the same robbery exactly. He is also on trial for his life or will be.

"She is here as a spectator and I think that she has a right to sit here and listen to this testimony and I think that maybe a guarantee of truth would be that this witness has to look at his mother—I want to finish—

"Mr. Galda: May we have this witness excused if we will have any colloquy of any length, both parties be excused until your Honor rules?

"The Court: He is almost finished.

"Mr. Monaghan: Therefore, Judge, I see no basis whatsoever to ask Mrs. Kingsley because of this witness' desire, to walk out of the courtroom or be removed.

"The Court: Thank you very much.

"Mr. Gross: I think anything that would restrain the free flow of any witness' testimony in any case, especially in a capital case, ought to be obviated.

"In this case if the witness feels easier to testify without a particular person present, or under any other circumstance, I think he ought to do whatever is necessary to enable him to do so.

"The Court: Thank you very much.

"Gentlemen, the Court will order Mrs. Kingsley removed from the courtroom during the time that Mr. Kingsley testifies.

"All right, bring in the jury.

"Now, Mr. Monaghan is waiting for his glasses.

"Incidentally, with reference to the exclusion of Mrs.—

"Mr. Galda: Mr. Bertini—

"The Court: Please pay attention.

"Mr. Bertini: May the record show my client does not wish me to consent to the witness' mother being—

"The Court: I am not interested in whether your client wishes to consent or not. Do you object?

"Mr. Bertini: I object.

"The Court: With reference to that objection, I refer you and Mr. Monaghan to State v. Genese and State v. Unger, 102 N.J.L. and 103 N.J.L." Transcript at 991–93.

2. Sixth Amendment: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial. * * *"

evidence is likely to involve the recital of scandalous or indecent matters which would have a demoralizing effect upon their immature minds." United States v. Kobli, 172 F.2d 919, 922 (3 Cir. 1949).[3] (Footnotes omitted.)

In United States v. Kobli, the trial judge, in a case where the defendant was being tried for a violation of the Mann Act, cleared the courtroom of all spectators except the defendant, his counsel, witnesses and members of the press. This court reversed and held that "the Sixth Amendment precludes the general indiscriminate exclusion of the public from a trial of a criminal case in a federal court over the objection of the defendant and limits the trial judge to the exclusion of those persons or classes of persons only whose particular exclusion is justified by lack of space or for reasons particularly applicable to them." Id. at 923.

Dennis Kingsley's brother Joseph Kingsley was under indictment for murder arising out of the same crime for which Laws was being tried. Earlier in cross-examination, Dennis testified to a conflict between his mother and himself. Under all the circumstances, we cannot conclude that the judge erred in excluding Dennis' mother since he felt that her continued presence in the courtroom would hinder the ascertainment of the truth. In United States ex rel. Bruno v. Herold, 408 F.2d 125 (2 Cir. 1969), cert. denied, 397 U.S. 957, 90 S.Ct. 947, 25 L.Ed.2d 141 (1970), the Court of Appeals for the Second Circuit upheld the action of a trial judge in excluding some spectators who the judge felt were intimidating the state's identification witness. It should be noted that the exclusionary order in Bruno was much broader than the order in the instant case where the judge excluded only one spectator during the cross-examination of one witness. "Here at most there was a single incident which at best could be likened unto discretionary courtroom 'housekeeping.'" 408 F.2d at 129. We conclude that the removal of Mrs. Kingsley was a sound exercise of the trial judge's discretion.

## II. Refusal to Grant a Severance

■ Laws asserts that he was denied a fair trial in violation of the Fifth and Fourteenth Amendments because of the trial judge's refusal to sever Laws' trial from Baker's trial or to grant a motion for a mistrial. Laws claims that by reason of these failures he was subjected to extreme prejudice. Baker was called as a prosecution witness and he testified that he did not know of his car's intended use when he loaned it to Laws on April 18th. At the completion of his testimony, the state moved for and the trial judge directed Baker's acquittal. Laws' motion for a mistrial was denied. Laws' argument runs as follows: The prosecutor in his opening makes references to Baker, describing him as a "buffoon," a "jerk," or a "slob." This, says Laws' counsel, is scarcely the description of a murderer. Baker was freed on reduced bail, while Laws and Washington were still incarcerated. Baker's bail had been reduced on motion of his court-appointed counsel, and with the apparent acquiescence of the prosecution. Baker's name was supplied to the attorneys for Laws and co-defendant Washington in answer to a bill of particulars seeking the names of witnesses. The prosecutor moved to discharge Baker as a defendant saying that he had no additional evidence or testimony against him. He went on to say, "[I]t bears out what I said in my opening again. There is nothing in my opinion legally from which the jury could find Mr. Baker guilty." He then asked for a directed verdict of acquittal as to Baker. Baker's counsel joined in the motion, and the court said that he agreed with the prosecutor and with Baker's counsel that there was insufficient evidence to hold Baker. Counsel for Washington asked for a mistrial, stating that this develop-

3. See generally, Note, The Right to a Public Trial in Criminal Cases, 41 N.Y.U.L.Rev. 1138 (1966).

ment "will have a terrible impact upon both defendants [Laws and Washington]. * * *" Laws' counsel then made the same motion.[4]

Laws insists that the calling of Baker as a witness for the prosecution was "akin to the knowing use of a witness who will plead the Fifth Amendment," citing Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), assertedly "building a case on inference rather than on fact." We do not understand this argument and we cannot accept it. In any event the circumstances of *Namet* and those of the case at bar are not analogous. Nor is Laws' position aided by the law of New Jersey. Cf. State v. Young, 46 N.J. 152, 215 A.2d 352 (1965).

On appeal in Laws' and Washington's case [5] the Supreme Court of New Jersey stated in respect to the issue before us: "The defendants suggest that the State knew before trial that it would move for Baker's acquittal but the record does not establish that fact. In any event, nothing before us indicates that either Washington or Laws suffered prejudice from the joinder of Baker or from his acquittal. That being so, any criticism which may be addressed to the prosecutorial tactics does not constitute reason for reversal of the convictions under appeal here." Laws supra, 50 N.J. at 175, 233 A.2d at 641.

■ Although Laws argues that the state knew before trial that Baker was not guilty and intended to move for his acquittal during the trial, there is no direct evidence in the record which supports this claim. Inferences might be drawn to the contrary. However, the prosecution could have reached substantially the same result even if severance had been granted and Laws had been tried prior to Baker, though the pressure on Baker, assuming that there was such, might have been somewhat less. The practice alleged by Laws, though we make no conclusion as to the verity of

Laws' assertions, might perhaps be thought to be an undesirable one from the point of view of the administration of justice but we cannot deem that the state's trial tactic, even if it be assumed that it was intended to apply pressure to Baker to obtain from him evidence favorable to the prosecution, rose to the height of unconstitutional denial of due process.

### III. Impeachment of Dennis Kingsley's Credibility

■■ On both direct and cross-examination, Dennis Kingsley testified with respect to certain juvenile transgressions and admitted that he committed them. The trial court later charged the jury that "such transgressions are not to be construed by you to affect his credibility as a witness in this case." He explained that "[u]nder the law such offenses are designated as juvenile transgressions and no person under the age of 18 years shall be deemed a criminal by reason of any adjudication relating to such offenses nor shall such an adjudication be deemed a conviction of a crime."

The Sixth Amendment right of confrontation has been made applicable to state court proceedings by the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 13 L.Ed. 2d 923 (1965). In *Pointer* the Court also stated that the right of cross-examination of witnesses is included in the right of an accused in a criminal case to confront witnesses. 380 U.S. at 404, 85 S. Ct. 1065. Laws argues that the "removal of these segments of Kingsley's testimony from the jury's consideration effectively frustrated [his] right to cross-examination and was a denial *nunc pro tunc* of his right to confrontation as guaranteed by the Sixth Amendment. * * *" However, the constitutional right to cross-examine witnesses does not include the right to impeach such witnesses through the use of any available

---

4. Tr. p. 1412, et seq.

5. United States ex rel. Washington v. Yeager, 3 Cir., 448 F.2d 87.

methods. In United States v. Evans, 398 F.2d 159, 164 (3 Cir. 1968), this court stated: "The question of the admissibility of impeaching evidence is not of constitutional proportion but is left to principles of common law." Cf. Rule 26, Fed.R.Crim.Proc., 18 U.S.C. Under N.J.S.A. 2A:81–12, a conviction of any crime can be shown to affect the credibility of any witness. Under N.J.S.A. 2A:4–39 no adjudication against a juvenile offender shall be deemed a conviction. Therefore we conclude that the trial judge acted properly in charging the jury to disregard Dennis Kingsley's juvenile transgressions.

## IV. Search and Seizure

■■ During a hearing on a motion to suppress evidence prior to the trial relevant facts were adduced and these are set forth succinctly in the first opinion of the New Jersey Supreme Court as follows:

"On April 27, 1965 Captain Spahr of the Bergen County Prosecutor's office applied to Judge Murtagh [6] for a warrant authorizing the search of Laws' apartment # 8 at 290 West 147th Street, New York City. He submitted an affidavit of his own, along with Dennis' affidavit which set forth that Dennis had read Spahr's affidavit and that the statements there set forth were true to Dennis' own knowledge. Spahr's affidavit stated that Dennis, a confidential informant, had told him that Hap had violated section 1897 of the Penal Laws of New York, McKinney's Consol.Laws, c. 40 [repealed in 1967], and that he, Dennis, had seen a shotgun and a .38 caliber revolver on April 18th at Hap's premises. It set forth that Dennis had told about the conspiracy in Hap's home to commit the robbery in Oradell and that proceeds thereof were to be taken to Hap's apartment [in violation of section 1308 of the Penal Laws of New

York, McKinney's Consol.Laws] [repealed in 1967]. Spahr's affidavit also referred to statements by Dennis that he saw ski masks and surgical gloves that Hap said would be used in robbing the terminal. Towards the close of his affidavit, Spahr stated that upon the basis of the 'foregoing reliable information' and his personal knowledge there was probable cause to believe that $12,000 in silver, $13,000 in currency, a shotgun, and a .38 caliber revolver, would be found in Hap's apartment and that a search warrant should be issued forthwith because there was danger that the property would be removed." 50 N.J. at 172, 233 A.2d at 639–640.

Laws argues first that the affidavits presented to Judge Murtagh were insufficient to establish probable cause and that a warrant issued without probable cause is unconstitutional under the Fourth and Fourteenth Amendments. Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

Before a magistrate can find the existence of probable cause, it is necessary that he "be informed of some of the underlying circumstances from which the informant concluded that the * * * [law was being violated], and some of the underlying circumstances from which the officer concluded that the informant * * * was 'credible' or his information 'reliable.'" Aguilar, id. at 114, 84 S.Ct., at 1514 (footnote omitted). The only substantial question here is whether Captain Spahr provided sufficient information in his affidavit from which Judge Murtagh could reasonably conclude that Dennis Kingsley was a reliable informant. Dennis' reliability was established by the statement in Spahr's affidavit that the victims of the robbery had sworn that the perpetrators of the robbery wore ski masks and surgical gloves identical in description to the ski masks and gloves which Dennis claimed

6. Judge John Martin Murtagh, then the Administrative Judge of the Criminal Court of the City of New York, is now a Justice of the Supreme Court of New York.

that he observed at Laws' apartment prior to the commission of the crime. Thus, Dennis' statement to Spahr was reasonably corroborated by other matters brought to Judge Murtagh's attention. We conclude, therefore, that there was sufficient reason for Judge Murtagh to believe that probable cause existed that Laws had violated sections 1897 and 1308 of the New York Penal Laws, McKinney's Consol.Laws, c. 40.

■ Laws argues further that, even assuming that probable cause existed at the time application was made for a search warrant, it was later developed at trial that much of the information contained in Spahr's affidavit was "false" or "inaccurate" and that when an affidavit is false or inaccurate and leads to the issuance of a warrant, the subsequent search and seizure based on that warrant is invalid. Laws supports this argument by enumerating in his petition for habeas corpus several instances where the trial testimony and sworn statement of Dennis Kingsley conflicted with the affidavit submitted to Judge Murtagh. First, it should be noted that this issue was not raised by Laws during the suppression hearing when he challenged other aspects of the legality of the search and seizure. If Laws' counsel felt that such a challenge would have been successful, he should have subpoenaed Dennis Kingsley to testify at the suppression hearing. Second, the Supreme Court has stated that factual inaccuracies in an affidavit, not going to the integrity of the affidavit, do not destroy probable cause for a search. Rugendorf v. United States, 376 U.S. 528, 532, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964). We have carefully reviewed the record and have concluded the factual inaccuracies do not destroy the essential integrity of the affidavit. In other words, if we eliminate that part of Spahr's affidavit which might be considered inaccurate, the portion remaining is sufficient to justify the issuance of a search warrant.

■ Finally, Laws maintains, first, that the search of Laws' apartment and the seizure of various items therein exceeded the scope of the warrant. See Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). Laws asserts, second, that it was illegal for the police officers to search, without warrant, his Plymouth automobile which was located at a parking lot a short distance from his apartment, citing Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925), and United States v. Holsey, 414 F.2d 458 (10 Cir. 1969). Laws contends that any testimony and physical evidence offered at trial with regard to these two assertedly illegal searches should not have been admitted under the rule in Mapp v. Ohio, *supra*. Laws was represented by counsel but these two issues were not raised in his motion to suppress the fruits of the allegedly illegal search and seizure. Nor were they raised during the course of the trial. It would appear, therefore, that under the Criminal Practice Rules of New Jersey he must be deemed to have waived these objections.[7]

Laws also maintains that the search of his apartment and the seizure of various items exceeded the scope of the search warrant. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). This point need not detain us long for the *Chimel* doctrine may not be applied retroactively. The search and seizure were permissible and the objects seized were admissible in evidence under pre-*Chimel* law.

7. See Criminal Practice Rules, 3:2A–6(a) in pertinent part as follows: "If a timely motion is not made in accordance with this rule, the defendant shall be deemed to have waived any objection during trial to the admission of evidence based on the ground that such evidence was unlawfully obtained."

In addition Laws asserts in this court that objects seized from the Plymouth automobile in the parking lot should not have been introduced in evidence.[7] Laws, however, took the stand on his own behalf and testified that he was in no wise connected to or had anything whatsoever to do with the robbery,[8] and that the Plymouth automobile in which the objects introduced in evidence were found was not his but belonged to a friend of his named Raymond Faison.[9] He stated that the Plymouth automobile was an automobile which he had borrowed on occasion. Actually Laws' counsel objected to the admission into evidence of the objects found in the Plymouth automobile on the ground that it had not been shown that the automobile belonged to Laws. This was the tactic employed by Laws at his trial, his trial strategy. In this court, however, completely changing his defense, Laws seems to proceed on the unique theory that he, using the automobile for the purposes of the robbery, made it his own and therefore he can rely on the Fourth and Fifth Amendments to exclude from evidence the objects contained in the automobile. In Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), the Supreme Court held that the Fourth Amendment protects privacy. The Fifth Amendment proscribes involuntary self-incrimination. But neither Amendment serves Laws here for under the circumstances of this case he does not have the standing to invoke these constitutional rights. Zimmermann v. Wilson, 105 F.2d 583, 586 (3 Cir. 1939); State v. Cage, 452 S.W.2d 125, 128 (Mo.

1970); People v. Lovins, 10 Mich.App. 524, 159 N.W.2d 862 (1968). Indeed, if Laws' theories were valid, a stolen car used in a robbery could not be searched and objects therein seized by the police without a search warrant.[10] We find no constitutional error here.

Assuming the contrary, however, that there was constitutional error in admitting into evidence the objects found in the Plymouth automobile these could have had only the most minor cumulative evidentiary value and effect. The proof of Laws' guilt was overwhelming without them. We therefore, follow the ruling of Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) as interpreted by Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969). See also our decision in United States of America ex rel DiRienzo, Appellant v. Yeager, 443 F.2d 228 (1971).

## V. Challenge to the Array of the Grand Jury

During the course of making several preliminary motions, counsel for Laws challenged the array of the Grand Jury on the ground that Negroes had been systematically excluded from serving. See Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), rehearing denied, 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965). The relevant portion of the transcript reveals the following:

"Mr. Bertini: I will challenge the array. I make a motion challenging the array of the Grand Jury.

7. The phrase employed by Mr. Justice Jacobs in State v. Laws, 50 N.J. 159, 233 A.2d 633, 639 (1967), "Laws' Plymouth" is incorrect. The phrase was probably used as a generality to indicate that the Plymouth was one of the cars employed by Laws and the others acting with him in the course of the robbery.

8. Laws testified: 'I did not do it. I had nothing to do with either the robbery or the murder.' Transcript 4142.

9. On direct examination Laws testified as follows:

"Q. I show you S. 30 in evidence. Do you own that car?
"A. No sir I do not.
"Q. What was the license number on that car?
"A. XB–1353.
"Q. Who owns that car?
"A. This car belongs to Mr. Raymond Faison." Transcript 3197.
S. 30 was a photograph of the Plymouth automobile.

10. It is not necessary to discuss here the applicability of any theory of contraband.

"The Court: The Grand Jury?

"Mr. Bertini: Yes.

"The Court: Your motion is denied without argument.

"Mr. Bertini: On the ground—

"The Court: Let me hear the grounds.

"Mr. Bertini: That members of the defendants' color have not been on the Grand Jury in the numbers that ought to be.

"The Court: What are those numbers?

"Mr. Bertini: I don't know. I think we will have to investigate.

"The Court: Wait a minute. You have had seven months to investigate this and you are coming over here a minute before the trial begins and saying that the Grand Jury of Bergen County was illegally selected by virtue of the fact that colored persons have been are you saying deliberately?

"Mr. Bertini: Systematically.

"The Court: Systematically and deliberately?

"Mr. Bertini: I didn't say deliberately.

"The Court: Excluded?

"Mr. Galda: I submit I know some of the people of that race who have sat on many of our Grand Juries.

"The Court: So does our Court know of that.

"Mr. Bertini: I am talking about the one man one vote principle.

"The Court: One man one vote principle?

"Mr. Bertini: I think the Supreme Court has got to place where there is justice, equality, et cetera. I say the ratio is not the proper proportion.

"The Court: You tell me what the ratio is in Bergen County since you are making such a charge. Tell me what the ratio in Bergen County should be.

"Mr. Bertini: I think if the defendant questions it we should investigate it.

"The Court: Why didn't you investigate it? Your motion is denied.

"Do you wish to add anything?

"Mr. Monaghan: I join in Mr. Bertini's motion on that.

"The Court: How about you, Mr. Gross?

"Mr. Gross [counsel for Baker]: I have no statement to make.

"The Court: Thank you, Mr. Gross." Transcript at 1.59–1.61.

The New Jersey Supreme Court affirmed the trial court and stated: "Under the circumstances, any other course would have grossly disserved the orderly administration of justice." 50 N.J. at 183, 233 A.2d at 645. See R.R. 3:3–2 (1968). In his petition to the District Court, Laws supports his argument by citing State of New Jersey v. Rochester, 105 N.J.Super. 529, 253 A.2d 558 (1967), aff'd, 54 N.J. 85, 253 A.2d 474 (1969). The District Court decided that Laws was not entitled to any relief since he presented no supporting facts for his assertion of systematic exclusion of Negroes from the Bergen County Grand Jury. Wade v. Yeager, 377 F.2d 841, 845 (3 Cir. 1967). We agree with the conclusion that Laws is entitled to no relief on this theory but base our holding on the fact that Laws did not present his motion at trial in a legally sufficient manner under New Jersey law. His motion, which was not made until the first day of the trial, was unsupported by any facts which, if true, would entitle Laws to the relief requested. Thus, under our view, it is unnecessary to consider the constitutional question of systematic exclusion, for Laws failed to make a proper and timely challenge under New Jersey law. Compare Wade v. Yeager, *supra*, at 846.

## VI. Conduct of the Trial Judge and Prosecutor

Laws had raised a number of issues concerning the judge's charge and the conduct of the prosecutor. We have reviewed the entire record and have concluded that there is no constitutional er-

ror in either the judge's charge or in his conduct or in the conduct of the prosecutor.

The order of the District Court will be affirmed.[11]

The court wishes to thank court-appointed counsel for his able representation of the appellant.

11. The opinion in this case should be read in conjunction with that of United States ex rel. Washington v. Yeager, 448 F.2d 87 filed concurrently with this opinion.